Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **PASI INVESTMENTS, LLC; U.S. RETIREMENT PARTNERS, INC. d/b/a DAYBRIGHT FINANCIAL,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JEFFREY PANGARO and PANGARO WEALTH MANAGEMENT, LLC,**<br><br>**Defendants.** | **Civil Action No.: 26-14194 (ES) (JBC)**<br><br>**OPINION AND ORDER** |

**SALAS, DISTRICT JUDGE**

Before the Court is Plaintiffs PASI Investments, LLC ("PASI") and U.S. Retirement Partners, Inc.'s ("USRP") Complaint, (D.E. No. 1 ("Compl.")), and application for a temporary restraining order against Defendants Jeffrey Pangaro ("Pangaro") and Pangaro Wealth Management, LLC ("PWM"), (D.E. No. 1-3 ("Mov. Br."). The Court carefully reviewed the parties' submissions and conducted a telephonic hearing on Plaintiff's application on November 4, 2026. For the reasons set forth herein, as well as those stated on the record during the hearing, Plaintiffs' application is **GRANTED**.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

This case involves the fallout from the end of a business relationship between Plaintiffs and Defendant Pangaro. On September 1, 2023, Defendant PWM sold its equity interest in PASI to Plaintiff USRP for $17.1 million. (Compl. ¶ 1). As part of that transaction, USRP acquired over 1,000 client accounts, which it continued to service under the PASI name. (*Id.* ¶¶ 2, 19). On the same date, and as "a material inducement to the transaction[,]" Defendant Pangaro entered into

a Management Contract with PASI whereby Pangaro "agreed to remain employed by PASI for a three-year term as managing director and further agreed to refrain from soliciting Plaintiffs' client accounts, and not to otherwise compete with Plaintiffs during the period of the Management Contract and for two-years following its expiration." (*Id.* ¶ 3; *see also id.* ¶¶ 26–28). The Management Contract also contained a provision prohibiting Pangaro from, among other things, divulging Plaintiffs' "Confidential Information" to third-parties for an indefinite period. (D.E. No. 1-4 at 155–170 (ECF Pagination) ("Management Contract") at § 7(a)). After the initial three-year term, the Management Contract was set to renew automatically for a series of additional one-year terms unless either side provided the other with a notice of termination at least 90 days before the end of the current term. (Management Contract at § 2(a)(i)).

The initial term of the Management Contract was set to expire on or about September 1, 2026. (D.E. No. 1-2 at 1 (ECF Pagination) ¶ 3). Pangaro provided Plaintiff with a non-renewal notice on or about May 27, 2026. (Compl. ¶ 35). Plaintiffs provided Pangaro with their own non-renewal notice the following day. (*Id.* ¶¶ 32–34). Plaintiffs allege that, even before providing his notice of non-renewal, Pangaro had begun taking steps to renew his old business, PWM. (*Id.* ¶ 36). Moreover, Plaintiffs allege that "rather than remain working with PASI through his September 1, 2026 termination date, Pangaro elected to stop working immediately upon receipt of Plaintiffs' notice of non-renewal." (*Id.* ¶ 37). Plaintiffs further allege that Pangaro did so "to allow him to focus his efforts on poaching clients from and competing with Plaintiffs." (*Id.*). Plaintiffs contend that "[c]ontemporaneous with the expiration of the Management Contract a slew of clients that Pangaro originated and/or transferred to Plaintiffs as part of the Equity Purchase Agreement subsequently terminated their relationship with PASI and, upon information and belief," became clients of Pangaro's resuscitated PWM. (*Id.* ¶ 38). This included the transfer of over 125 client

accounts between August 20 and September 20, 2026, and the diversion of over $50 million in assets. (*Id.* ¶¶ 39–40).

Based on the Complaint, it appears that Plaintiffs may have first learned of Pangaro's alleged breach of his contractual obligations in or about July of 2026 when a client informed PASI that Pangaro called the client to inform him that he would be leaving PASI and would "be in touch . . . shortly[.]" (*Id.* ¶ 41). That client then "terminated his relationship with Plaintiffs in late July 2026." (*Id.*). Plaintiffs provide other examples of similar activity in September 2026. (*Id.* ¶¶ 42–43).

On September 16, 2026, Plaintiffs sent Pangaro a cease-and-desist letter, reminding him of his post-employment obligations and documenting known breaches. (*Id.* ¶ 49). Pangaro's counsel responded "and denied any liability." (*Id.* ¶ 51). Plaintiffs allege that Pangaro nevertheless continued to breach his obligations under the Management Contract, improperly competing with Plaintiffs and soliciting their clients. (*Id.* ¶¶ 44–47, 52–56).

Plaintiffs filed a Complaint on October 30, 2026, asserting the following ten causes of action against Defendants: (i) Breach of Contract - Non-Compete (against Defendant Pangaro); (ii) Breach of Contract - Non-Solicitation of Customers (against Defendant Pangaro); (iii) Breach of Contract - Non-Disclosure (against Defendant Pangaro); (iv) Tortious Interference with Contract (against PWM); (v) Misappropriation of Trade Secrets (against all Defendants); (vi) Unfair Competition (all Defendants); (vii) Breach of Duty of Loyalty (against Pangaro); (viii) breach of fiduciary duty (against Pangaro); (ix) aiding and abetting breach of duty of loyalty (against PWM); and (x) aiding and abetting breach of fiduciary duty (against PWM). (Compl. ¶¶ 60–145). Plaintiffs also seek a temporary restraining order "(i) enjoining Pangaro from breaching the terms of the restrictive covenants contained in the Management Contract . . . [and] (ii) enjoining

PWM from servicing any current or former client of Plaintiffs through August 31, 2028." (Mov. Br. at 31).

This Court scheduled a telephone conference regarding Plaintiffs' emergent application for injunctive relief November 4, 2026. (D.E. No. 4). Shortly before that proceeding, Defendant Pangaro submitted a declaration in opposition to Plaintiffs' application. (D.E. No. 15). The Court then conducted a telephonic hearing after reviewing the parties' respective submissions, and allowed counsel to place their respective arguments on the record.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs temporary restraining orders and preliminary injunctions. "If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b)." *Int'l Foodsource, LLC v. Grower Direct Nut Co.*, No. 16-3140, 2016 WL 4150748, at *6 (D.N.J. Aug. 3, 2016) (citation omitted). Such "[i]njunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *See Westchester Fire Ins. Co. v. Glob. Real Constr., LLC*, No. 09-0207, 2009 WL 137414, at *1 (D.N.J. Jan. 20, 2009) (quoting *Kos Pharm. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). "The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate." *Int'l Foodsource, LLC*, 2016 WL 4150748, at *6.

Specifically, a court may grant temporary restraints only if a party shows: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos*, 369 F.3d at 708 (citation omitted). That test is conjunctive, such that "[a] plaintiff's failure to establish any element in its favor renders a

preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters. Inc.*, 176 F.3d 151, 153 (3d Cir. 1999); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."). "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

## III. DISCUSSION

### a. Likelihood of Success on the Merits

#### i. Alleged Breach of the Management Contract

The Court begins by considering whether Plaintiffs have established a likelihood of success on the merits of their relevant claims. This requires Plaintiffs to show that they have a significantly better than negligible, but not necessarily more likely than not, chance of ultimately prevailing on the merits of those claims. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). While Plaintiffs have asserted 10 causes of action, their TRO application is premised on their contentions that (i) Pangaro breached the restrictive covenants contained in the Management Contract; and (ii) PWM tortiously interfered with that contract. (D.E. No. 1-3 at 18–23). The Court will therefore focus solely on those claims. Moreover, as Plaintiffs' breach of contract claims involve restrictive covenants, the Court must conduct a two-part analysis. First, Plaintiffs must establish that the restrictive covenants are enforceable under New Jersey law. Second, Plaintiffs must establish a traditional breach of contract claim.

i. **Enforceability**

As to the first issue, the test for enforceability is one of reasonableness. *Comet Mgmt. Co. v. Wooten*, No. A-1892-17T1, 2020 WL 897973, at *5 (N.J. Super. Ct. App. Div. Feb. 25, 2020). It "requires the court to determine whether: '(1) the restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public.'" *Id.* (quoting *Cmty. Hosp. Grp. v. More*, 869 A.2d 884, 897 (N.J. 2005)); *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 171 (3d Cir. 2015); *see also Howmedica Osteonics Corp. v. Howard*, No. 19-19254, 2022 WL 16362464, at *8 (D.N.J. Oct. 28, 2022) (citing *Solari Indus., Inc. v. Malady*, 264 A.2d 53, 61 (N.J. 1970)). "New Jersey courts also take into consideration three additional factors to determine whether a restrictive covenant is overbroad: its duration; the geographic limitations; and the scope of prohibited activities." *Howmedica Osteonics Corp.*, 2022 WL 16362464, at *8 (citing *More*, 869 A.2d at 897). The Court must also remain mindful that Plaintiffs seek to enforce what appear to be three distinct restrictive covenants: (i) a prohibition on the solicitation of Plaintiffs' clients; (ii) a prohibition on sharing Plaintiffs' confidential information with third-parties; and (iii) a general restriction on any competition with Plaintiffs. The Court must separately consider whether each is enforceable.

**1. Employer's Legitimate Interests**

In evaluating an employer's legitimate interests, courts consider the need to protect "trade secrets or proprietary information," "customer relationships," and any other "highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment." *ADP, LLC v. Kusins*, 215 A.3d 924, 943 (N.J. Super. Ct. App.

Div. 2019) (internal quotations and citation omitted). There is typically no legitimate interest in "preventing competition . . . or preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry." *Ethicon, Inc. v. Randall*, No. 20-13524, 2021 WL 2206106, at *20 (D.N.J. May 28, 2021) (first quoting *Kusins*, 215 A.3d at 943; and then quoting *ADP, LLC v. Lynch*, No. 16-1111, 2020 WL 1922590, at *16 (D.N.J. Apr. 21, 2020)) (cleaned up). The Court notes, however, that "New Jersey courts afford more deference to restrictive covenants ancillary to the sale of a business because the participants in the sale of a business have more equal bargaining power." *Arch Personal Care Products, L.P. v. Malmstrom*, 90 F. App'x 17, 21 (3d Cir. 2003) (citing *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J.1993)). In such situations, "[t]he courts seek to protect the 'good will' established by the seller and transferred to the buyer. Good will includes intangibles like company reputation and customer relationships." *Id.* (citation omitted).

Here, Plaintiffs have clearly established a legitimate interest in a restrictive covenant preventing Pangaro from soliciting their clients—including client accounts he previously sold to them through the Equity Purchase Agreement and then serviced on their behalf pursuant to the Management Contract. They have similarly established an interest in prohibiting Pangaro from distributing their confidential information (i.e., client lists) to third parties such as PWM.[1] Turning to the restrictive covenant barring Pangaro from competing with Plaintiffs, the Court agrees that Plaintiffs have a legitimate interest in protecting the goodwill and other intangible interests they acquired through the Equity Purchase Agreement. The Court will, therefore, move on to the next

[1] Section 7(a) of the Management Contract prohibits Pangaro from divulging Plaintiffs' "Confidential Information." The definition of "Confidential Information" explicitly includes "customer or client lists[.]" (Management Contract § 7(a)(ii)).

steps of the analysis with regard to the restrictive covenants.

### 2. **Undue Hardship**

Under the undue hardship prong, courts must determine whether the employee is likely to find work in his or her field under the employment restrictions in place. *HR Staffing*, 627 F. App'x at 172; *Ethicon*, 2021 WL 2206106, at *21. Where, as here, an employee terminates its relationship with its employer, "the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." *Sunbelt Rentals, Inc. v. Love*, No. 20-17611, 2021 WL 82370, at *18 (D.N.J. Jan. 11, 2021); *HR Staffing*, 627 F. App'x at 172 (finding no undue hardship where defendant "brought any hardship upon himself" after voluntarily ceasing his employment with plaintiff and joining a competitor (quoting *More*, 869 A.2d at 895)). Furthermore, courts in this district have held that no undue hardship exists when a non-compete agreement provides "some flexibility, such as working for a competitor in a non-competitive role." *See Sunbelt*, 2021 WL 82370, at *19.

Here, the Court sees no basis for finding that enforcing the three restrictive covenants at issue might subject Pangaro to any undue hardship. The restrictions, taken together, amount to temporarily prohibiting Pangaro and his company from working with Plaintiffs' former clients, and from working with clients in the State of Connecticut. He retains the flexibility necessary to work in his chosen field in essentially every other respect. Moreover, the Court stresses that Pangaro was not just a former employee of Plaintiffs. Context is important. He *sold* his former business—including an extensive portfolio of client accounts—to Plaintiffs for a significant sum. He simultaneously agreed, as part of that deal, to stay with the company to manage those accounts for a set period of time, and to refrain from soliciting those clients or directly competing against Plaintiffs for a set period upon his departure. The Court does not see how holding Pangaro to the

consequences of his bargain in this context would impose an undue hardship.

### 3. **Public Injury**

Finally, under the public injury prong, courts consider whether enforcing a non-compete agreement would cause harm to the public. *Ethicon*, 2021 WL 2206106, at *28. "In assessing this prong, courts consider 'the demand for the services rendered by the employee and the likelihood that those services could be provided by other [employees] already practicing in the area." *HR Staffing*, 627 F. App'x at 173 (alteration in original) (quoting *Karlin v. Weinberg*, 390 A.2d 1161, 1169–70 (N.J. 1978)). For instance, "[t]he public interest in access to medical care can weigh against enforcement of an otherwise reasonable non-compete where the employee has special skills used to provide direct patient care." *Id.*

Here, the Court finds no obvious risk of public injury. The covenants in question would restrict Plaintiffs' clients from utilizing the services of a single financial advisor, Mr. Pangaro, through the end of August 2028. They would not be required to work with Plaintiffs. Their choice of financial advisors would otherwise be unfettered. Further, nothing in the record suggests that Mr. Pangaro provides services that other financial advisors cannot. Similarly, while defense counsel suggested during the hearing that the timing of any injunction may cause issues with the clients' year-end financial planning, nothing in the record suggests those clients could not find suitable replacement advisors in a timely fashion.

### **4. Conclusion**

For these reasons, and for those addressed on the record during the November 4, 2026 hearing, the Court finds that Plaintiffs have established a reasonable likelihood of success in establishing that each of the three restrictive covenants at issue in this case are enforceable under New Jersey law. Specifically, those restrictions serve Plaintiffs' legitimate interests, will not

impose an undue hardship upon Defendants, and will not result in any public injury. Moreover, given the nature of those restrictions, and the context of the Management Contract, nothing in the record suggests that the "additional factors" courts typically consider (i.e., duration, geographic limitation, or scope of prohibited activities), *Howmedica Osteonics Corp.*, 2022 WL 16362464, at *8, would alter that analysis. The Court will, therefore, evaluate those restrictions when considering Plaintiffs' breach of contract claims.

### ii. <u>Breach of Contract</u>

Under New Jersey law, a plaintiff must prove four elements to establish a breach of contract:

> [F]irst, that the parties entered into a contract containing certain terms; second, that [the] plaintiff did what the contract required [the plaintiff] to do; third, that [the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract; and fourth, that [the] defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.

*Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)). The Court finds that Plaintiffs have done so.

Plaintiff USRP entered into the Management Contract with Pangaro, whereby Pangaro agreed, in relevant part, that he would not, either during his employment with Plaintiffs or for the two years following the termination of that employment:

> (i) accept as a client or directly or indirectly (A) solicit, entice, induce or accept any person or entity which at any time during such period shall be a client or customer of the Company and/or any of the Affiliated Entities to become a client or customer of any other person (including the Executive individually) or entity with respect to any products, services or activities produced, provided or engaged in by the Company and/or any of the Affiliated Entities at such time or which otherwise directly compete with the Company and/or any of the Affiliated Entities, or (B) otherwise interfere with the relationship of the Company and/or any of the Affiliated Entities with any such client or customer (and for purposes of this paragraph,

> a client or customer of the Company and/or any Affiliated Entities shall include any individual benefit plan participant or employer with whom the Company and/or any Affiliated Entitles have an account with a balance or insurance policy of any kind);

(D.E. No. 1-4 at 164 (ECF Pagination)). The record reflects that Pangaro breached that provision after the parties exchanged notices of non-renewal under the Management Contract (reflecting that Pangaro's employment with PASI would end in September 2026), by actively soliciting Plaintiffs' clients to leave with him. (D.E. No. 1-2 at 1–4 ("Decl. of Ronald Fishman") ¶¶ 9–11). The record further reflects that certain of those clients did, in fact, leave their existing relationships with Plaintiffs to continue working with Pangaro. (*Id.* ¶ 8). Indeed, during the November 4, 2026 hearing, defense counsel admitted that certain of Plaintiffs' former clients had moved their accounts to Pangaro's business. The record similarly reflects that Pangaro breached Section 7(a) of Management Contract by sharing "Confidential Information" (i.e., client lists or related information) with PWM, and that he breached Section 7(b)(ii) of that agreement by directly competing with Plaintiffs. (*See* Mov. Br. at 10). Nothing in the record sufficiently establishes that Plaintiffs failed fulfil their own obligations under the Management Contract.[2]

Plaintiffs have, therefore, established a reasonable likelihood of success on their breach of contract claim against Pangaro.

---

[2] The Court notes that Defendant Pangaro submitted a declaration wherein he represented that Plaintiffs breached the Management Contract by failing to pay all amounts due him. (*See generally* D.E. No. 15). Pangaro argues that he is, therefore, not bound by the restrictive covenants contained in Section 7(b) of the Management Contract. (*Id.* ¶¶ 10–13). Indeed, the restrictions of Section 7(b) do not apply if USRP "shall have breached [the Management Contract.]". (Management Contract § 7(b)). While that argument, if proven, may establish a defense against certain of Plaintiffs' breach of contract claims, the Court finds that Plaintiffs have nonetheless shown a "significantly better than negligible" chance of prevailing on the merits. *Reilly*, 858 F.3d at 179. Moreover, Pangaro's restrictions concerning the use of Plaintiffs' confidential information under Section 7(a) of the Management Contract apply regardless of any breach on Plaintiffs' part. (Management Contract § 7(a)).

#### i. **Tortious Interference**

In support of their request for injunctive relief against Defendant PWM, Plaintiffs assert that PWM tortiously interfered with Plaintiffs' rights under the Management Contract. To prevail on a claim for tortious interference with contract under New Jersey law, a party must establish: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Fid. Eatontown, LLC v. Excellency Enter., LLC*, 16-3899, 2017 WL 2691417, at *5 (D.N.J. June 22, 2017) (quoting *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996)). The Court finds that Plaintiffs have established a reasonable likelihood of success on this claim.

As to the first element, Plaintiffs have established a reasonable expectation that they would not lose existing clients to Pangaro either during his employment or for the two years that followed thereafter. As for the second element, Plaintiffs allege that "by allowing and providing a platform to Pangaro to solicit and accept Plaintiff's clients, PWM has intentionally, tortiously and without justification interfered with the Management Contract." (Compl. ¶ 94). That allegation is particularly plausible considering Plaintiffs' allegation that Pangaro owns 100% of PWM. (*Id.* ¶¶ 9–10). Turning to the third element, the Court finds that there appears to be an obvious, direct causal connection between PWM's alleged interference and Plaintiff's loss: Pangaro solicited the clients and Plaintiffs lost them. Finally, Plaintiffs' damages—the loss of clients—is likewise clear. The same general logic would apply vis-à-vis Plaintiffs' claim that PWM tortiously interfered with the portion of the Management Contract prohibiting Pangaro from competing with Plaintiffs (i.e., that Plaintiffs had a reasonable expectation on non-competition, that PWM intentionally provided

the vehicle by which Pangaro was able to compete with Plaintiffs, and that Plaintiffs suffered harm as a result).

Plaintiffs have, therefore, established a reasonable likelihood of success on their tortious interference claim against PWM.

**b. Irreparable Harm**

The Court next considers whether Plaintiffs would suffer irreparable harm if the Court denies the injunctive relief sought. Plaintiffs have the burden of proving a "clear showing of immediate irreparable injury" absent injunctive relief. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "To be entitled to the extraordinary remedy of a preliminary injunction, demonstrating the mere possibility of harm is not enough. Instead, a plaintiff must show an imminent risk of irreparable injury that cannot wait to be redressed until trial is over." *Vita-Pure, Inc. v. Bhatia*, No. 14-7831, 2015 WL 1496396, at *4 (D.N.J. Apr. 1, 2015) (citing *Hynoski v. Columbia Cnty. Redevelopment Auth.*, 485 F. App'x 559, 563 (3d Cir. 2012)). Put another way, the movant must establish that without an injunction, it will suffer harm that cannot be sufficiently redressed after trial. *See, e.g.*, *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528 (D.N.J. 1999) (noting that "the word irreparable connotes that which cannot be repaired, retrieved, put down again or atoned for" (cleaned up)). Thus, "economic loss does not constitute 'irreparable harm.'" *Id.* at 529.

Judges in this District have routinely recognized, however, that "[w]here an employee solicits customers of his former employer on behalf of his new employer, there is irreparable harm." *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *8 (D.N.J. June 15, 2009); *accord Saturn Wireless Consulting, LLC v. Aversa*, No. 17-1637, 2017 WL 1538157, at *19 (D.N.J. Apr. 26, 2017) ("Likewise, New Jersey courts recognize that 'the diversion of a company's

customers may [ ] constitute irreparable harm, [and that] [t]his is so because the extent of the injury to the business as a result of this type of conduct cannot be readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages.'") (citation omitted). This Court is therefore satisfied that Defendants' solicitation of Plaintiffs' clients constitutes irreparable harm sufficient to justify injunctive relief. The Court likewise finds that Pangaro's continued direct competition with Plaintiffs, which threatens to destroy the good will and other intangible interests they acquired through the Equity Purchase Agreement, would also result in irreparable harm.

**c. <u>Harm to Defendants</u>**

Next, the Court must balance the potential hardships to the parties to "ensure that the injunction does not harm the defendants more than denial of the injunction would harm the plaintiff[s]." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 230 (D.N.J. 2009). The Court finds that it would not. Indeed, as the injunction against solicitation would simply prohibit Defendants from taking Plaintiffs' existing clients and using Plaintiffs' information for their own ends, the scale appears to be perfectly balanced. For instance, if Defendants have those clients, then Plaintiffs do not, and vice-versa. Nor does the Court find that a limited restriction on Pangaro's ability to compete with Plaintiffs would tip the scales in his favor. As the Court noted above when finding that the restriction would not impose an undue hardship upon Pangaro, that restriction in sufficiently limited in scope. This factor weighs in favor of issuing injunctive relief.

**d. <u>Public Interest</u>**

Finally, the Court must consider the impact any proposed injunction would have on the public. Similar to the court in *Ethicon*, this Court "discerns no major public component involved in a preliminary injunction, because nothing in the record indicates" that enforcement of the restrictive covenants at issue "may diminish the rights of the public to have free access to a

particular type of good or service." 2021 WL 2206106, at *28 (citing *ADP, LLC v. Pittman*, No. 19-16237, 2019 WL 5304148, at *17 (D.N.J. Oct. 18, 2019)). Furthermore, the Court recognizes that the public has an interest in the judicial enforcement of valid restrictive covenants, which promote "stability and certainty in business and employment relationships." *Id.* (citing *Nat'l Reprographics, Inc.*, 621 F. Supp. 2d at 230). The Court therefore finds that this factor favors the issuance of a temporary restraining order.

Accordingly, in exercising its discretion, the Court finds that all four factors balance in favor of granting Plaintiffs' requested relief. *See Reilly*, 858 F.3d at 179.

**e. Bond Requirement**

Finally, Federal Rule of Civil Procedure 65(c) requires that "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "It has previously been recognized that the Third Circuit strictly interprets the security bond requirement of Rule 65(c)." *Payroll Associates., LLC v. Adaptasoft, Inc.*, No. 12-6375, 2012 WL 12888566, at *3 n.3 (D.N.J. October 24, 2012) (citing cases). At the Court's direction, the parties met and conferred regarding a proper bond amount and jointly proposed "that the Court set bond in the amount of $250,000 secured through a letter of credit by Plaintiff [USRP] and/or its lenders." (D.E. No. 16). The Court finds that to be an acceptable bond amount, and will adopt the parties' proposal.

## IV. CONCLUSION

Based on the foregoing, as well as the reasons set forth on the record on November 4, 2026, **IT IS** on this 6th day of November, 2026,

**ORDERED** that Plaintiffs' application for a temporary restraining order is **GRANTED**; and it is further

**ORDERED** that Defendants shall appear and show cause before Undersigned at the Martin Luther King Building and U.S. Courthouse in Newark, New Jersey, on the 20th day of November, 2026, at 12:00 p.m., or as soon thereafter as counsel can be heard, as to why an order should not be entered pursuant to Federal Rule of Civil Procedure 65(a) granting a preliminary injunction in favor of Plaintiffs enjoining:[3]

**Defendant Pangaro** from violating the restrictive covenants contained in the Management Contract, specifically not to:

1) accept as a client or directly or indirectly solicit, entice, induce, or accept any person or entity which is a client or customer of PASI or USRP, to become a client or customer of any other person (including the Executive individually) or entity with respect to any products, services, or activities produced, provided or engaged in by the Company and/or any of the Affiliated Entities at such time or which otherwise directly compete with the Company and/or any of the Affiliated Entities;
2) interfere with the relationship of PASI and/or any of the Affiliated Entities with any such client or customer (and for purposes of this paragraph, a client or customer of the Company and/or any Affiliated Entities shall include any individual benefit plan participant or employer with whom the Company and/or any Affiliated Entitles have an account with a balance or insurance policy of any kind);
3) participate, be employed by, associated with or in any manner connected with, or render services or advice to any other business which is competitive with PASI or USRP and is within the geographic area serviced by PASI or USRP;

[3] For the purposes of this Order, all defined terms (e.g., "Executive[,]" "Company[,]" "Affiliated Entities") shall have the meaning set forth in the Management Contract.

4) directly or indirectly solicit, entice, or induce any person who is an employee, consultant, or independent contractor of PASI or USRP to become employed or engaged by Pangaro or by any other person or entity or to terminate their relationship with PASI or USRP;
5) service any client or customer of PASI or USRP, or any former client or customer of PASI or USRP who was a client or customer of USRP during Pangaro's employment with PASI.

**Defendant PWM** from tortiously interfering with the restrictive covenants contained in the Management Contract, specifically not to:

1) allow Pangaro to engage or invest in, own, manage, operate, or control, participate, be employed by, associated with or in any manner connected with or render services or advice to PWM **solely to the extent that entity offers services in Connecticut that directly compete with Plaintiffs**; and
2) service any client or customer of PASI or USRP, or any former client or customer of PASI or USRP who was a client or customer of USRP during Pangaro's employment with PASI.

and it is further

**ORDERED** that pending a ruling by the Court on or after the hearing set by this Order to Show Cause, the following temporary relief is granted pursuant to Federal Rule of Civil Procedure 65(b):

**Pangaro** is temporarily restrained from:

1) competing with PASI or USRP **in the State of Connecticut** through continued active employment, service, and/or ownership of PWM or any other competitive entity;

2) directly or indirectly soliciting PASI's or USRP's clients, including individuals or entities that were PASI or USRP clients during Pangaro's employment with PASI;

3) directly or indirectly soliciting PASI's or USRP's employees; and

4) disclosing, using, or exploiting any of PASI's or USRP's Confidential Information (as that term is defined in the Management Contract), including Client information.

**PWM** is temporarily restrained from:

1) allowing Pangaro to engage or invest in, own, manage, operate, or control, participate, be employed by, associated with or in any manner connected with or render services or advice to PWM **solely to the extent that entity offers services in Connecticut that directly compete with Plaintiffs**; and

2) servicing any client or customer of PASI or USRP, or any former client or customer of PASI or USRP who was a client or customer of USRP during Pangaro's employment with PASI.

and it is further

**ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs shall post a bond with the Clerk of the Court in the amount of $250,000.00, secured through a letter of credit by Plaintiff USRP and/or its lenders; and it is further

**ORDERED** that Defendants shall file and serve any response to Plaintiff's request for a preliminary injunction **on or before November 10, 2026**; and it is further

**ORDERED** that Plaintiffs shall file any reply papers **on or before November 13, 2026**; and it is further

**ORDERED** that the parties shall meet and confer—as the Court directed during the November 4, 2026 hearing—regarding an alternative briefing and hearing schedule. Those

discussions shall also account for the need for any expedited discovery necessary for a meaningful resolution of Plaintiffs' application, as well as the prospect of mediation. The parties shall advise the Court of any proposed, alternative schedule **on or before November 9, 2026**. If the parties agree on an alternative schedule**, and to hold any temporary restraints in place pending the Court's resolution of the preliminary injunction application**, the Court will vacate the briefing and hearing deadlines set forth herein.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**